IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ARTURO P. ABRAHANTE, JR., | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, |  |
| v. | Civil No. 07-5701 (JBS/KMW) |
| PTLM. JOHNSON, et al., |  |
| Defendants. | **OPINION** |

APPEARANCES:

Arturo P. Abrahante, Jr.
#586952-68085
Southern State Correctional Facility
P.O. Box 150
Delmont, NJ 08314
    <u>Pro</u> <u>Se</u> Plaintiff

James R. Birchmeier, Esq.
POWELL, BIRCHMEIER & POWELL, ESQS.
1891 State Highway 50
P.O. Box 582
Tuckahoe, NJ 08250-0582
    Attorney for the Defendants

**SIMANDLE**, District Judge:

    This action, brought pursuant to 42 U.S.C. § 1983, arises

out of Plaintiff's allegations that police officers employed

excessive force during his arrest and that Defendants Patrolman

Joseph Johnson, Corporal Gerald Krivda, Sergeant Orlando Pagan,

Patrolman Kirk Cooksey, and Patrolman Stephen Pagnotto

(collectively, "Defendants") failed to intervene.  Plaintiff does

not claim that any particular Defendant is the officer who

employed excessive force; rather, Plaintiff's theory of liability

rests on Defendants' failure to intervene when Plaintiff was subjected to excessive force by unnamed police officers, despite having the duty and opportunity to do so.  Presently before the Court is Defendants' motion for summary judgment on grounds of qualified immunity and upon the merits [Docket Item 31].  The principal issues are: (a) whether the Plaintiff has proffered sufficient evidence of the violation of his constitutional right to be free from excessive use of force in which bystander officers fail to intervene; and (b) whether a reasonable officer in Defendants' position under the circumstances presented herein would have known that the failure to intervene violated Plaintiff's constitutional rights.  For the reasons discussed below, the Court will grant in part and deny in part Defendants' motion.

**I.   BACKGROUND**

**A.   Facts**

1.   <u>Facts Prior to Plaintiff's Arrest</u>

On the morning of May 14, 2006, Plaintiff Arturo P. Abrahante, Jr. ("Plaintiff") committed an armed robbery of a Gulf gas station located on Route 130 in Carneys Point, New Jersey, armed with a handgun.  (Abrahante Dep. at 21:21-22:2.)  Plaintiff fled the scene on foot and entered a nearby wooded area.  (<u>Id.</u> at 22:3-7.)  Upon entering the woods, Plaintiff dropped a handgun, a cell phone and money.  (<u>Id.</u> at 24:24-25:6.)  When Plaintiff

initially entered the woods, police were not yet in pursuit. (Id. at 22:8-11.)  According to Plaintiff, on the day of the robbery he wore brown jeans, white sneakers, a black t-shirt and a baseball cap.  (Id. at 24:12-15.)

While on patrol some time after 7:04 a.m., Defendants Cpl. Gerald Krivda and Ptlm. Joseph Johnson, officers of the Carneys Point Township Police Department, received a call from dispatch reporting that the Gulf gas station had just been robbed at gun point.  (Defs.' Br. Ex. B at 1.)  Dispatch reported that the subject was running southbound on Route 130.  (Id.)  The accused was described as a male subject approximately 5 feet 4 inches tall and wearing a brown jacket and jeans.  (Defs.' Br. Ex. D at 1-2.)  Krivda and Johnson traveled northbound on Route 130 seeking to intercept the suspect.  (Defs.' Br. Ex. B at 1.)

Upon arrival at the scene, a male individual in the gas station parking lot pointed to the wooded area to the south near a softball field.  (Id.)  Krivda and Johnson initiated a search within the woods.  (Id.)  Krivda radioed his dispatcher and requested assistance from the New Jersey State Police and the Bridge police[1] in order to have K-9 units at the scene.  (Id.) Police cars from neighboring districts and from Bridge police arrived at the scene to assist in the investigation and officers

---

[1]  "Bridge Police" appears to be used as shorthand for Delaware River & Bay Authority Police.

established a perimeter.  (Defs.' Br. Ex. D at 2.)

At approximately 7:20 a.m., Defendant Sgt. Orlando Pagan of the Penns Grove Police Department responded as additional backup. (Defs.' Br. Ex. F.)  Pagan took a position to the north of where the other officers had entered the wooded area to conduct their search.  (Id.)  While searching the area, Sgt. Pagan observed "a black male subject" approximately 300 feet from his position running northbound along the fence line of the softball field. (Id.)  Pagan yelled for the subject to stop before giving chase and continuing to order the subject to stop.  (Id.)  The subject ignored Pagan's command and continued to run northbound before entering the woods, where Sgt. Pagan lost sight of him.  (Id.) Sgt. Pagan radioed the other units to inform them of his pursuit and location, and that the suspect was now wearing "a dark color blue tee-shirt."  (Id.)

Defendant Ptlm. Stephen Pagnotto also responded to the original dispatch regarding the robbery and assumed a stationary position near the intersection of Route 130 and Route 140. (Defs.' Br. Ex. E.)  While stationed on Route 140 just east of the intersection, Pagnotto was approached by a female in a vehicle who alleged to have been at the gas station at the time of the robbery.  (Id.)  She gave an account of the suspect's escape route which conflicted with the information that the Carneys Point officers had received.  (Id.)  During Pagnotto's

4

conversation with the female driver, he received Sgt. Pagan's transmission indicating the suspect's position and that Pagan was in pursuit.  (Id.)  Pagnotto then responded to the location that Sgt. Pagan reported and assisted in the investigation.  (Id.)

Upon arrival of New Jersey State Police K-9 units, all other officers exited the woods.  (Defs.' Br. Ex. B at 1.)  Sgt. Pagan provided the K-9 units with information for their search and took position on the perimeter on Route 130.  (Defs.' Br. Ex. F.)  As the K-9 units were searching the woods, Cpl. Krivda observed "large amounts" of U.S. currency near the shoulder of road. (Defs.' Br. Ex. B at 2.)  Approximately twenty minutes into the K-9 units' search, Krivda was informed that a silver handgun and a brown hooded sweatshirt had been found in the woods.  (Id.) All responding law enforcement agencies continued the search for "several hours" before it was terminated pending further investigation.  (Id.)

At approximately 2:11 p.m. that afternoon, Carneys Point Police received a phone call from Elaine M. Wright, owner of Clemente's Farm on Route 130.  (Defs.' Br. Ex. D at 2.)  Wright reported seeing a male wearing a dark shirt and dark pants exiting her barn and crossing her property eastbound toward Manor Avenue.  (Defs.' Br. Ex. B at 2.)  The barn was located "just a third of a mile" from the location of the earlier police search for the robbery suspect.  (Id.)  Cpl. Krivda, Ptlm. Johnson, and

units from other districts responded to the location.  (Defs.'
Br. Ex. D at 2.)  Krivda was proceeding on foot in a field behind
Manor Avenue when a resident informed him that the suspect had
run past the rear of his house.  (Defs.' Br. Ex. B at 2.)  There
is some dispute as to what happened next with respect to
Plaintiff's apprehension and arrest.

    2.  <u>Defendants' Account of the Arrest</u>

Cpl. Krivda reports that upon turning the corner around the
resident's house, he "observed a Hispanic male wearing a black T-
shirt [and] black pants running with mud totally covering his
body."  (<u>Id.</u>)  According to Krivda, he "yelled at the subject for
him to stop running and told him he was under arrest."  (<u>Id.</u>)
The suspect "looked back at [Krivda] and ran into a dense area of
trees."  (<u>Id.</u>)  The suspect attempted "to elude [Krivda] by
running further [into] the dense wooded area" (<u>Id.</u>)  Believing
that the suspect might still have been armed, Krivda waited for
him to exit the woods.  (<u>Id.</u>)

According to Cpl. Krivda, he again yelled and ordered the
suspect to stop running, after which the suspect "appeared to be
reaching into his waist band."  (<u>Id.</u>)  Krivda reports that "[o]ut
of fear for [his] safety as well as [that of] other Officers at
the scene" he tackled the suspect "to the ground with only enough
force to lawfully effectuate his arrest."  (<u>Id.</u>)  According to
Cpl. Krivda, Plaintiff "violently resisted and attempted to pull

6

his hands from [Krivda's]" grasp.  (Id.)  Defendant Ptlm. Kirk
Cooksey, of the Pennsville Township Police Department, "assisted
[Krivda] further by handcuffing the suspect."  (Id.)

Ptlm. Cooksey reported that he was "directly behind" Cpl.
Krivda when Krivda tackled Plaintiff.  (Defs.' Br. Ex. C at 1.)
According to Cooksey, he "jumped on the subject" and he and
Krivda "began to struggle with the subject as he would not comply
with [their] instructions."  (Id.)  Cooksey states that "the
suspect was reaching in his waistband as if he was attempting to
conceal, discard evidence or produce a weapon."  (Id.)  Cooksey
then "grabbed the accused's left arm and placed it in a wrist
lock compliance hold and pulled it behind his back."  (Id.)
According to Cooksey's account, Cpl. Krivda "grabbed
[Plaintiff's] right arm and after a brief struggle the accused
was handcuffed successfully."  (Id.)

After reporting to Clemente's Farm, Ptlm. Johnson heard a
radio transmission reporting that a District 5 unit "had the
suspect in a farm field just behind Manor Ave."  (Defs.' Br. Ex.
D at 2.)  Johnson reported that "Cpl. Krivda also called out on
location."  (Id.)  Upon arrival at Manor Avenue, Johnson received
another radio transmission stating that the suspect was in
custody.  (Id. at 2-3.)  Ptlm. Johnson reports that he advised
the suspect (Plaintiff) of his Miranda rights as he, Cpl. Krivda
and Ptlm. Cooksey escorted him to a patrol unit.  (Id. at 3.)

Sgt. Pagan reports that at approximately 2:14 p.m. he reported to Manor Avenue in response to the possible sighting of the suspect. (Defs.' Br. Ex. F.) According to his account, Pagan assisted Carneys Point Police officers in the search at this location. (Id.) After the suspect was reported to be in custody, Sgt. Pagan went to the location of the arrest and identified Plaintiff as the same individual that ran from him earlier that day. (Id.)

According to Cpl. Krivda, after Plaintiff was transported to the police station, Plaintiff complained of pain in his left arm. (Defs.' Br. Ex. B at 2.) An ambulance was dispatched to the station and Plaintiff was transported to Salem County Hospital for diagnosis. (Id.) Cpl. Krivda escorted the ambulance to the hospital and while there he observed that Plaintiff had scratches on his arms and that his face was cut. (Id.) Cpl. Krivda's account surmises that the scratches and cut "could have occurred while running in the woods as [the officers] chased [Plaintiff] earlier in the day." (Id.)

### 3.   Plaintiff's Account of the Arrest

According to Plaintiff, after he initially ran into the woods and dropped the handgun, he "kept running because [he] heard sirens." (Abrahante Dep. at 22:17-18.) Mr. Abrahante did not see any police officers on foot in the woods, but he saw a police vehicle and heard K-9 units. (Id. at 23:1-10.) Upon

8

seeing the police vehicle and hearing the K-9 units, Mr.
Abrahante did not voluntarily exit the woods.  (Id. at 23:11-15.)
During the several hours between the robbery and his
apprehension, Mr. Abrahante "had a pretty good idea" that police
were searching for him.  (Id. at 24:8-11.)

Mr. Abrahante denies that any officer was required to tackle
him upon his exit from the woods at the time of his apprehension.
(Id. at 27:22-28:1.)  Mr. Abrahante claims that he walked out of
the woods and "several different police vehicles pulled up."
(Id. at 26: 14-16.)  According to Mr. Abrahante, the police
officers "came out of their cars running at [him] and told [him]
to get on the [ground]."  (Id. at 27:4-5.)  Mr. Abrahante claims
he did exactly as he was told and got "right on the [ground],
hands up, on the [ground]."  (Id. at 27:5-7.)  After putting his
hands up and getting face down on the ground, Mr. Abrahante
claims, "they put handcuffs on [him]."  (Id. at 28:4-14.)  Mr.
Abrahante denies resisting in any way any officer trying to
handcuff him.  (Id. at 28:15-18.)  He also denies attempting to
put his hand in his waist as an officer tried to get his hands
behind his back.  (Id. at 28:19-29:1.)  Rather, according to Mr.
Abrahante, he voluntarily placed both hands behind his back.
(Id. at 30:3-5.)

Plaintiff testified in his deposition that he did not "know
what officers specifically put [the handcuffs] on [him], but one

of these officers that arrested [him] put the handcuffs on [him]." (Id. at 28:11-14.)  To his knowledge, one officer handcuffed him.  (Id. at 29:2-4.)  Mr. Abrahante had not sustained any type of injury to this point.  (Id. at 30:9-11.) In Plaintiff's affidavit in response to Defendants' motion for summary judgment, Mr. Abrahante claims that once he was on the ground, "Cpl. Krivda placed his knee into [Plaintiff's] lower back and as he began to place the handcuffs on [Plaintiff], [P]tlm. Cooksey jumped on [Plaintiff's] back and immediately kneed [his] left side ribs and Forcefully pulled [Plaintiff's] left arm back and placed the handcuffs on [him]."  (Pl.'s Aff. ¶ 1.)

According to Plaintiff's deposition, while he was handcuffed and face down on the ground, the officers "told [him] that you city slickers think you can come down here, through the country and commit crimes and get away with it" and threatened to hurt him if he did not confess.  (Id. at 32:3-7.)  Plaintiff's affidavit alleges that Cpl. Krivda and Ptlm. Cooksey told the other officers present "that they got the Nigger/spic that they were looking for" and "that they were tired of these nigger/spics coming down from the city into their country and committing crimes."  (Pl.'s Aff. ¶ 2.)  One of the two officers, according to the affidavit but not alleged elsewhere, then "smacked [Plaintiff] in the head with a pair of handcuffs and told [him]

that [he] was going to confess to committing this crime or [he] would receive much more damage than that little smack they gave [him]." (Id.)

    While handcuffed and still on the ground, according to Plaintiff, "[a]n officer stepped in front of [him] and [punched him] directly in [his] arm and threatened to do further damage . . . if [he] didn't confess to the crime." (Id. at 30:17-20.) Mr. Abrahante claims he was punched one time in the back of his left arm, above the elbow. (Id. at 32:10-22.) According to Plaintiff's account, he "was apprehended, on the [ground] several minutes" and was not punched in the arm immediately. (Id. at 57:11-14.) At the time he was punched, Mr. Abrahante alleges that 10 or 12 officers, from several departments, were "standing around." (Id. at 57:15-58:8.) After Mr. Abrahante was assaulted, "the officers picked [him] up off the ground and put [him] in a police vehicle and took [him] to the police station." (Id. at 32:24-33:3.)

    At the police station, police officers interrogated Mr. Abrahante for "about 45 minutes." (Id. at 33:9-12.) Mr. Abrahante only remembers telling the interviewing officer his name and that he was "in an extreme amount of pain and . . . needed to go to the hospital." (Id. at 34:9-11.) After the forty-five minutes of interrogation, according to Mr. Abrahante, "they finally called the rescue squad" and he was taken to the

11

hospital.  (Id. at 33:12-14.)

When Mr. Abrahante first arrived at the hospital, Cpl. Krivda was in the room with him and "tried to have a conversation" with him.  (Id. at 37:16-22.)  Mr. Abrahante does not remember what Cpl. Krivda said to him.  (Id. at 37:24-38:1.) When the doctor questioned Mr. Abrahante about the injury to his arm, Mr. Abrahante told the doctor that "the police had punched [him] in [his] arm while [he] was handcuffed laying face down on the ground." (Pl.'s Aff. ¶ 12.)  According to Mr. Abrahante, as the doctor was leaving the room, Cpl. Krivda followed and told the doctor "to put in his report that the police tackled [Plaintiff] and that is how [he] received [his] injuries."  (Id.) Mr. Abrahante yelled to the doctor that "the police were lying and that they punched [him] in [his] arm."  (Id.)

Mr. Abrahante cannot identify which one of the officers punched him in the arm and cannot provide a description of "exactly what the officer looks like," but claims "it was one of these officers here."  (Abrahante Dep. 30:24-31:5.)  Both Plaintiff's complaint and his affidavit describe the officer only as "Caucasian."  (Compl. at 6; Pl.'s Aff. ¶ 5.)  According to Plaintiff, he "had [his] face down in the ground and [his] eyes [were] watering."  (Id. at 31:2-3.)  Plaintiff identified the five named defendants from police reports regarding his arrest. (Id. at 31:6-10.)  Mr. Abrahante claims that each of the named

defendants was present at the scene of his arrest when he was punched in the arm.[2]  (Id. at 55:24-56:13.)

    4.   Plaintiff's Injuries

Plaintiff suffered a fracture to his left humerus and radial nerve damage.  (Id. at 19:20-21.)  Mr. Abrahante underwent surgery that entailed insertion of a metal plate and approximately thirty screws into his arm.  (Id. at 49:16-21.) Due to Plaintiff's injuries, his left arm became paralyzed and he lost all sensation in the arm for several months.  (Id. at 39:23-24.)  Mr. Abrahante complained of continuing pain and disability in the use of his arm as of the time of his deposition.  (Id. at 43:10-44:1.)  The "Use of Force" report submitted by Cpl. Krivda indicated that Plaintiff's injuries and subsequent transportation to the hospital resulted from police use of force.  (Defs.' Br. Ex. B at 3.)

**B.  Procedural History**

On November 27, 2007, Plaintiff, proceeding pro se, filed this action against Defendant Police Officers Johnson, Krivda, Pagan, Cooksey and Pagnotto, as well as unknown John Doe Law Enforcement Officers.  In his Complaint, Plaintiff alleges that

---

[2]  Plaintiff ultimately reached a plea agreement in which he pled guilty to second degree robbery.  (Defs.' Br. Ex. G at 9:4.) Plaintiff was sentenced to five years in New Jersey State Prison with application of the New Jersey No Early Release Act, which requires him to serve eighty-five percent of his sentence before being eligible for parole.  (Defs.' Br. Ex. H at 9:17-20.)

the five named Defendants violated his constitutional rights by failing to intervene when an officer used excessive force by physically assaulting him while he was handcuffed and face-down on the ground in a submissive position.  On February 17, 2009, Defendants filed the motion for summary judgment presently under consideration, in which they assert qualified immunity as to Plaintiff's claims [Docket Item 31].  On March 11, 2009, Plaintiff filed a document labeled "move for summary judgment" and an attached affidavit; however, as it appears this is his opposition to Defendants' motion, the Court will construe it as such [Docket Item 35].  Defendants then filed a letter brief in opposition to Plaintiff's "motion" on March 17, 2009 [Docket Item 36], followed by an opposition brief on April 23, 2009 [Docket Item 38].

## II.  DISCUSSION

### A.   Standard of Review

Summary judgement is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, a court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all

justifiable inferences are to be drawn in [that party's] favor.'"
Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  "In qualified
immunity cases, this usually means adopting . . . the plaintiff's
version of the facts."  Scott v. Harris, 550 U.S. 372, 378
(2007).  "[T]he judge's function is not himself to weigh the
evidence and determine the truth of the matter but to determine
whether there is a genuine issue for trial."  Anderson, 477 U.S.
at 249.

### B.   Failure to Intervene Claims

Plaintiff's Complaint does not allege that one of the named
Defendants is the officer who punched him in the arm while he was
handcuffed and on the ground, and Plaintiff is unable to identify
the officer who did so.  Instead, Plaintiff alleges that each of
the five named Defendants was present at the scene of his arrest
and failed to intervene when an officer physically assaulted him.
Defendants argue that they are entitled to qualified immunity as
to Plaintiff's assertion that officers used excessive force and
that they therefore cannot be liable for failing to intervene.[3]

---

[3]  Defendants present their arguments based on the
assumption that Plaintiff has asserted claims of both excessive
force and failure to intervene against all named defendants.  He
has not.  As previously discussed, Plaintiff accuses Defendants
only of failing to intervene while unknown officers used
excessive force (perhaps because Plaintiff recognizes the
difficulty of bringing an excessive force claim when he is unable
to identify the perpetrator).  As such, the Court need only
consider whether Defendants are entitled to qualified immunity as

The Court first reviews the considerations governing its analysis of the qualified immunity defense and then addresses such considerations as they apply to Plaintiff's failure to intervene claims.

       1.   <u>Qualified Immunity Standard</u>

As an "accommodation of competing values," qualified immunity strikes a balance by permitting a plaintiff to recover for constitutional violations where the defendant officer was "plainly incompetent or . . . knowingly violate[d] the law," while immunizing an officer who "made a reasonable mistake about the legal constraints on his actions." <u>Curley v. Klem</u>, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted).

> The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Groh v. Ramirez</u>, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (citing <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

<u>Pearson v. Callahan</u>, 129 S.Ct. 808, 815 (2009).

The Court's assessment of whether a defendant is entitled to

---

to Plaintiff's allegations that they failed to intervene. Nevertheless, because the use of excessive force is necessary to trigger an officer's duty to intervene, the Court must also determine whether there are sufficient facts from which a jury could conclude that Plaintiff was the victim of excessive force during his arrest.

qualified immunity hinges on two considerations.[4]  The Court must determine "whether the plaintiff has alleged a deprivation of a constitutional right at all," id. at 816 (citation omitted), which, as the Court of Appeals has emphasized, is not a question of immunity as such, "but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity." Curley, 499 F.3d at 207.  In addition, the Court must address "whether the right that was [allegedly] violated was clearly established, or, in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (internal quotations and citations omitted).  The inquiry into whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (citation omitted).

   2.   Failure to Intervene

   The Court of Appeals discussed the scope of a police

---

   [4]  While under Saucier v. Katz, 533 U.S. 194 (2001), overruled in part by Pearson, 129 S.Ct. at 818, the qualified immunity analysis followed a "rigid order of battle," Pearson, 129 S.Ct. at 817 (citation omitted), under which the question of whether a right was clearly established was assessed only if the plaintiff had adequately alleged a violation in the first place, the Supreme Court adopted a more flexible approach in Pearson. As the Court explained, "[b]ecause the two-step Saucier procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking will best facilitate the fair and efficient disposition of each case." Pearson, 129 S.Ct. at 821.

17

officer's duty to prevent another officer from using excessive force in Smith v. Mensinger:

> Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior. "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986); accord Putnam v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981); Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972). However, an officer is only liable if there is a realistic and reasonable opportunity to intervene. See Clark, 783 F.2d at 1007 (instructing the district court upon remand to determine whether the officer was in a position to intervene); Brishke, 466 F.2d at 11 (liability for failure to intervene exists only if the beating occurred in the officer's presence or was otherwise within his knowledge); Putnam, 639 F.2d at 423-24 (liability exists only if the non-intervening officer saw the beating or had time to reach the offending officer).

Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002).

Because a failure to intervene claim cannot lie without an alleged constitutional violation in the first instance, the Court begins the qualified immunity analysis by first discussing Plaintiff's contention that police officers violated his constitutional rights by subjecting him to excessive force. The Court then examines Plaintiff's claim that Defendants failed in their duty to intervene.

For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion for summary judgment. The Court finds that triable issues of fact exist which preclude

a finding that all Defendants are entitled to qualified immunity
as a matter of law.  As to Defendant Pagnotto, the Court finds
that the evidence is insufficient to enable a reasonable finder
of fact to conclude that Ptlm. Pagnotto violated Plaintiff's
constitutional rights.  However, as to Defendants Johnson,
Krivda, Pagan and Cooksey, the Court finds that a genuine issue
of material fact exists as to whether these Defendants deprived
Plaintiff of a constitutional right.

> a.   Use of Force During Plaintiff's Arrest

In order to survive summary judgment on his claims that
Defendants failed to intervene, Plaintiff must first present
evidence that police officers used excessive force.  See Smith,
293 F.3d at 650-51.  The Fourth Amendment prohibits the use of
excessive force by a law enforcement officer.  Carswell v.
Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004) (citing
Graham v. Connor, 490 U.S. 386, 395 (1989)).  As the Court of
Appeals explained in Couden v. Duffy:

> In deciding whether challenged conduct constitutes
> excessive force, a court must determine the objective
> reasonableness of the challenged conduct, considering the
> severity of the crime at issue, whether the suspect poses
> an immediate threat to the safety of the officer or
> others, and whether he is actively resisting arrest or
> attempting to evade arrest by flight.  Other factors
> include the duration of the officer's action, whether the
> action takes place in the context of effecting an arrest,
> the possibility that the suspect may be armed, and the
> number of persons with whom the police officers must
> contend at one time.

Couden, 446 F.3d at 496-97 (internal quotations and citations

omitted).  Moreover:

> The "reasonableness" of a particular use of force must be
> judged from the perspective of a reasonable officer on
> the scene, rather than with the 20/20 vision of hindsight
> . . . . Not every push or shove, even if it may later
> seem unnecessary in the peace of a judge's chambers,
> violates the Fourth Amendment.   The calculus of
> reasonableness must embody allowance for the fact that
> police officers are often forced to make split-second
> judgments – in circumstances that are tense, uncertain,
> and rapidly evolving – about the amount of force that is
> necessary in a particular situation.

Graham, 490 U.S. at 396-97 (internal quotations and citations

omitted).

Applying these considerations to the facts presented and

viewing the evidence in the light most favorable to Plaintiff,

the Court finds that a reasonable fact-finder could conclude that

police officers used excessive force against Plaintiff and

thereby violated his Fourth Amendment rights.  Plaintiff

testified during his deposition that he voluntarily placed his

hands behind his back, (id. at 30:3-5), and that he did not

resist any attempt to handcuff him.  (Id. at 28:15-18.)   After

being handcuffed, and while lying face-down on the ground,

according to Plaintiff, officers threatened to harm Plaintiff if

he did not confess to the robbery.  (Id. at 32:6-7).  Though not

alleged elsewhere, Plaintiff alleges in his affidavit that either

Cpl. Krivda or Ptlm. Cooksey "smacked [him] in the head with a

pair of handcuffs" and threatened to harm him further if he

failed to confess.[5]  (Pl.'s Aff. ¶ 2.)  According to Plaintiff,
it was after he was handcuffed and still on the ground that an
officer stepped in front of him and punched him in the arm.  (<u>Id.</u>
at 30:17-18.)  In addition, Cpl. Krivda's "Use of Force" report
indicates that Plaintiff's injuries – which were rather extensive
– resulted from use of force by police.  (Defs.' Br. Ex. B at 3.)

        The Court concludes that a genuine issue of material fact
exists as to whether police officers used excessive force against
Plaintiff.  Defendants' version of the facts may indicate that
Plaintiff was "attempting to evade arrest by flight" and
"actively resisting arrest," and that Cpl. Krivda believed that
Plaintiff posed "an immediate threat to the safety of" himself
and others when Krivda allegedly tackled Plaintiff to the ground.
<u>See</u> <u>Couden</u>, 446 F.3d at 497 (internal quotations and citations
ommitted).  However, Plaintiff alleges that he neither evaded nor
resisted arrest and that he was assaulted <u>after</u> he was handcuffed
and submissive on the ground, which factual allegations this
Court must accept for purposes of this summary judgment motion.
Although Plaintiff does not know which officer allegedly struck
him, a jury could reasonably find that an officer employed
excessive force against Plaintiff even if Plaintiff – as he lay

---

        [5] Plaintiff's failure to forward this allegation previous
to his affidavit may raise issues of credibility, but upon a
motion for summary judgment, it is not the Court's function "to
weigh the evidence and determine the truth of the matter."
<u>Anderson</u>, 477 U.S. at 249.

face-down and handcuffed on the ground with 10 or 12 officers present – could not identify the officer.  If a jury were to credit Plaintiff's testimony, it could reasonably conclude that arresting officers violated Plaintiff's Fourth Amendment rights by employing force that was objectively unreasonable and therefore excessive.  See Couden, 446 F.3d at 497 (finding excessive force as a matter of law where there was no evidence that plaintiff "was resisting arrest or attempting to flee").

Upon a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.  In other words, it is for the jury to determine whether Plaintiff evaded and resisted arrest, and whether police officers physically assaulted Plaintiff after he was handcuffed and subdued on the ground. Because resolution of these issues implicates "disputes over facts that might affect the outcome of the suit under the governing law," Anderson, 477 U.S. at 248, summary judgment is not appropriate as to whether police officers' use of force against Plaintiff constitutes excessive force.

b.   Duty to Intervene

Having found that Plaintiff has presented evidence which precludes summary judgment as to police officers' use of force against him, the Court next examines Plaintiff's failure to

intervene claims.  The Court first discusses Plaintiff's claim
that Ptlm. Pagnotto failed to intervene when another officer
allegedly employed excessive force against him and that Pagnotto
thereby violated Plaintiff's constitutional rights.  For the
reasons set forth below, the Court will grant summary judgment as
to Plaintiff's claim against Ptlm. Pagnotto.

The Court finds that no genuine issue of material fact
exists as to whether Ptlm. Pagnotto violated Plaintiff's Fourth
Amendment rights by failing to intervene.  Upon summary judgment,
a disputed issue is "genuine" if "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248.  Even drawing all justifiable
inferences in Plaintiff's favor, see id. at 255, there is no
evidence from which a fact-finder could find that Ptlm. Pagnotto
possessed "a realistic and reasonable opportunity to intervene"
when Plaintiff's Fourth Amendment rights were allegedly violated.
Smith, 293 F.3d at 651.  Plaintiff testified in his deposition
that he identified and named Ptlm. Pagnotto and the other named
Defendants solely based on the police reports of his arrest.
(Abrahante Dep. at 31:6-10.)  Plaintiff's allegation that Ptlm.
Pagnotto (as well as the other four named Defendants in this
case) was present at the scene of his arrest when he was punched
in the arm is consequently based only on his review of the police
reports – he has no independent recollection placing Pagnotto at

23

the scene.   (Id. 55:24-56:13.)   According to Plaintiff, the officers' police reports place each of them at the scene at the time he was assaulted.   (Id. at 55:24-56:7.)

Plaintiff relies solely on the police reports in placing Ptlm. Pagnotto at the scene.   However, according to Ptlm. Pagnotto's report, on which Plaintiff relies, Ptlm. Pagnotto was not present at the scene of Plaintiff's arrest later that day. The record supports the fact that Pagnotto responded to the area of the robbery and assisted in the investigation at that location.   (Defs.' Br. Ex. E.)   According to his report, Ptlm. Pagnotto's involvement in Plaintiff's apprehension apparently ended at that point and the report does not indicate that Pagnotto responded to the scene of Plaintiff's arrest. Plaintiff's contention that Ptlm. Pagnotto was present at the scene of his arrest – based on the police reports alone – is therefore not supported by any evidence and no reasonable jury could conclude that Ptlm. Pagnotto had a realistic and reasonable opportunity to intervene.   Accordingly, the Court will grant Defendants' motion for summary judgment as to Plaintiff's claim against Defendant Pagnotto.

The Court does find, however, that a genuine issue of material fact exists as to whether Defendants Johnson, Krivda, Pagan and Cooksey violated Plaintiff's Fourth Amendment rights by failing to intervene when an officer allegedly used excessive

24

force against Plaintiff.  As is the case with Ptlm. Pagnotto, Plaintiff claims that these four Defendants were present when he was unlawfully assaulted.  Plaintiff again relies on the police reports of his arrest in order to place these Defendants at the scene of his arrest.  However, the facts in the record indicate that each of the four remaining Defendants was present either during or soon after Plaintiff's apprehension and before Plaintiff was transported from the scene.  The evidence indicates that Krivda and Cooksey assisted one another in subduing and handcuffing Plaintiff.  (Defs.' Br. Ex. B at 2; Defs.' Br. Ex. C at 1.)  According to the facts in the record, Ptlm. Johnson arrived at the scene after Plaintiff was in custody, and Johnson, Krivda and Cooksey escorted Plaintiff to a patrol car.  (Defs.' Br. Ex. D at 3.)  According to Sgt. Pagan's police report, Pagan responded to the location of Plaintiff's arrest and identified Plaintiff as the same individual that Pagan had pursued earlier in the day.  (Defs.' Br. Ex. F.)  Plaintiff contends that he was not punched immediately, but instead "was apprehended, [and] on the [ground] several minutes" while officers threatened to harm him before an officer struck him.  (Abrahante Dep. at 57:10-14.) Thus, it may be demonstrated at trial that Pagan, as well as Krivda, Cooksey and Johnson, were present when an officer was punching the handcuffed and subdued Plaintiff and had a realistic and reasonable opportunity to intervene but just stood by.

The Court concludes that a reasonable jury, were it to credit Plaintiff's testimony, could find that Defendants Johnson, Krivda, Pagan and Cooksey had the opportunity but failed to intervene when an officer violated Plaintiff's Fourth Amendment rights by using excessive force.  Giving Plaintiff the benefit of all favorable inferences, the evidence in record is sufficient to support Plaintiff's claim that these four Defendants were present at the time of his alleged assault, observed it happening, and did not take any steps to stop it.  Just as it is for the jury to determine the facts of Plaintiff's allegations of excessive force, the jury must make the factual conclusions necessary to determine whether these Defendants had "a realistic and reasonable opportunity to intervene."  Smith, 293 F.3d at 651.

### 3.   Qualified Immunity Analysis

As the foregoing discussion demonstrates, Plaintiff has indeed alleged a deprivation of the constitutional right to be free from the excessive use of force, triggering the constitutional duty of the arresting officers to intervene against another officer's excessive force, and thus satisfying the first condition of the qualified immunity analysis under Pearson, 129 S.Ct. at 818-21.  The second consideration remains, namely, "whether the right that was [allegedly] violated was clearly established, or, in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in

the situation he confronted." <u>Curley</u>, 499 F.3d at 207.  As applied to this case, the Court must determine whether it would be clear to a reasonable officer who observes a fellow officer using excessive force by punching a handcuffed and non-resisting suspect after arrest that failing to intervene would constitute a violation of the suspect's constitutional rights as an arrestee.

The Court finds that it would be clear to a reasonable officer that failing to intervene when a fellow officer employs excessive force against a suspect would be an unlawful violation of the suspect's constitutional rights.  As the Court of Appeals has observed, "[c]ourts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force." <u>Smith</u>, 293 F.3d at 650.  Before the events of this case, no fewer than eleven Circuit Courts of Appeals recognized, as a constitutional right of the arrestee, an officer's duty to intervene when a fellow officer employs excessive force. <u>See</u> <u>Smith</u>, 293 F.3d at 650-51; <u>see also</u> <u>Randall v. Prince George's County, Md.</u>, 302 F.3d 188, 204 (4th Cir. 2002); <u>Mick v. Brewer</u>, 76 F.3d 1127, 1136 (10th Cir. 1996); <u>Robins v. Meecham</u>, 60 F.3d 1436, 1442 (9th Cir. 1995)(Eighth Amendment claim); <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 207 n. 3 (1st Cir. 1990); <u>O'Neill v. Krzeminski</u>, 839 F.2d 9, 11 (2d Cir. 1988); <u>Byrd v. Clark</u>, 783 F.2d 1002, 1007 (11th Cir. 1986); <u>Webb v. Hiykel</u>, 713 F.2d 405, 408 (8th Cir.

1983); <u>Ware v. Reed</u>, 709 F.2d 345, 353 (5th Cir.1983); <u>Bruner v. Dunaway</u>, 684 F.2d 422, 426 (6th Cir.1982); <u>Byrd v. Brishke</u>, 466 F.2d 6, 11 (7th Cir. 1972).  Though unpublished and not precedential, the Court also gives deference to the Court of Appeals' conclusion in <u>Garbacik v. Janson</u> that for the purposes of qualified immunity, "the duty to intervene on the part of nonsupervisory [officers] was clearly established [before 1997]" (i.e., before the incidents in dispute in this case). <u>Garbacik v. Janson</u>, 111 F. App'x. 91, 94 (3d Cir. 2004) (citing <u>Fundiller v. Cooper City</u>, 777 F.2d 1436, 1441-1442 (11th Cir.1985); <u>Webb</u>, 713 F.2d at 408 (8th Cir.1983); <u>Ware</u>, 709 F.2d at 353 (5th Cir.1983); <u>Bruner</u>, 684 F.2d at 426 (6th Cir.1982); <u>Brishke</u>, 466 F.2d at 11 (7th Cir.1972)).  Finally, courts within the District of New Jersey have consistently recognized an officer's duty to intervene when a constitutional violation such as the use of excessive force takes place against a victim.  <u>See</u> <u>Kounelis v. Sherrer</u>, No. 04-4714, 2005 WL 2175442, at *5 (D.N.J. Sept. 06, 2005); <u>Boston v. New Brunswick Police Dept.</u>, No. 04-5921, 2005 WL 1661582, at *3 (D.N.J. July 15, 2005); <u>Edwards v. Union Tp. Police Dept.</u>, No. 05-3280, 2005 WL 1657031, at *2 (D.N.J. July 12, 2005); <u>La v. Hayducka</u>, 269 F. Supp. 2d 566, 581 (D.N.J. 2003).  Based on the overwhelming weight of the cited case law prior to 2006, the Court concludes that a reasonable officer facing the situation that the remaining Defendants confronted,

namely, observing as a fellow officer employs excessive force against a suspect and failing to intervene, would know that his conduct was unlawful.  The Court will therefore deny Defendants' motion for summary judgment as to Plaintiff's claims against Defendants Johnson, Krivda, Pagan and Cooksey.

## III. CONCLUSION

For the reasons explained above, the Court will grant in part and deny in part Defendants' motion for summary judgment. The Court will grant Defendants' motion as to Plaintiff's failure to intervene claim against Defendant Pagnotto.  Defendants' motion as to Plaintiff's failure to intervene claims against Defendants Johnson, Krivda, Pagan and Cooksey will be denied. The accompanying Order will be entered.


**July 14, 2009**                          **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        United States District Judge